IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| The London Manhattan Company, | Civil Action No. 2:08-CV-00465-PMD |
| Plaintiff, | |
| vs. | DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| CSA-Credit Solutions of America, Inc., | |
| Defendant. | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant CSA-Credit Solutions of America, Inc. respectfully moves the Court for an order granting summary judgment in Credit Solutions' favor on all of Plaintiff The London Manhattan Company's claims.[1]

## INTRODUCTION

London Manhattan holds itself out as a financial broker that promises not to collect any commission fees unless and until a client successfully closes a loan. Despite these promises—which are repeated throughout both London Manhattan's website and the contract it provides its clients—this case involves London Manhattan's misuse of the legal process to collect commission fees from Credit Solutions even though Credit Solutions never received any financing from London Manhattan or from any other lender. As explained below, there is no factual or legal basis for London Manhattan's attempts to extort fees from Credit Solutions here. The Court should grant this Motion, enter judgment in Credit Solutions' favor on both of London Manhattan's contract-based claims, and put an end to London Manhattan's deceptive model for extorting commission fees from out-of-state clients.

---

[1] Pursuant to Local Civil Rule 7.04, DSC, Credit Solutions' Motion for Partial Summary Judgment and the supporting memorandum are combined into this single document.

**UNDISPUTED FACTS**

**I.     Credit Solutions entered into a brokerage contract with London Manhattan in which London Manhattan would not be due any commission fees unless and until it successfully secured a closable loan for Credit Solutions.**

In August 2007, Credit Solutions and London Manhattan entered into a contract under which London Manhattan agreed "to arrange for and/or to provide" up to $40 million in senior debt facilities for Credit Solutions. Ex. A, Agreement ¶ "Engagement and Duties of LMC," at 1. Under the express terms of the contract, which was drafted by London Manhattan and presented on London Manhattan letterhead, any potential fee owed to London Manhattan would not be due until (1) London Manhattan secured an acceptable financing arrangement for Credit Solutions and (2) Credit Solutions was able to close on the proposed financing deal. *See id.* ¶ "Payment," at 2 ("The Company [Credit Solutions] agrees that Investment Banking Fees referred to in this Agreement are earned as of the acceptance by the Company of a financing proposal, but are payable at closing as provided herein.").

This "risk free" proposition is consistent with representations parroted throughout London Manhattan's website. *See, e.g.*, London Manhattan Company, "Commercial Financing Without Advance Fees" ("We do not charge advance fees, and our fees are paid from the proceeds of new financing acceptable to you, the client, at the closing. ***No closing, no fee.*** And it's entirely your decision whether or not to close.") (emphasis added), *available at* http://www.londonmanhattan.net/index.htm (last visited Sept. 25, 2009); London Manhattan Company, "Hiring The London Manhattan Company" ("The London Manhattan agreement requires no advance payment of fees. Instead, London Manhattan's advisory and investment banking fees are success-based, ***payable only at the closing of the financing***.") (emphasis added), *available at* http://www.londonmanhattan.net/hiring-lmc.htm (last visited Sept. 25, 2009).

**II.  London Manhattan placed Credit Solutions with a lender with which London Manhattan has never successfully closed a transaction, but who secretly promised to protect London Manhattan's commissions.**

Pursuant to this agreement, London Manhattan put Credit Solutions in touch with Atalaya Capital Management, a hedge fund with which London Manhattan had considerable experience, but with which it had never successfully brokered a financial deal. *See* Ex. B, Dep. Ron Giguere, President, as Rule 30(b)(6) Witness for The London Manhattan Company, 29:5–12 (Dec. 18, 2008) (confirming that London Manhattan never had a client successfully close a deal with Atalaya). Negotiations between Credit Solutions and Atalaya took a suspicious track. First, Atalaya proposed to provide a loan of $40 million to Credit Solutions, but it demanded a deposit of $100,000 to begin the negotiation process. Next, Atalaya slashed its loan proposal to $28 million, then to $20 million, and again to $12 million, but it consistently demanded additional fees from Credit Solutions to continue negotiations. Finally, when Credit Solutions insisted that any additional fees should be made a part of closing, rather than on an on-going basis throughout the negotiation process, the deal fell through. Credit Solutions ultimately paid approximately $225,000 in fees and devoted countless hours of manpower from its executive staff to this project over the course of several months in exchange for absolutely nothing.

During this negotiation period, in which Credit Solutions was routinely bled for additional fees, London Manhattan was secretly colluding with Atalaya to ensure its own brokerage commissions in the event that the loan did not close. *See, e.g.*, Ex. C, Email from Ron Giguere, President, The London Manhattan Company, to other principals of London Manhattan, Nov. 12, 2007 ("[Randall Fontes, with Atalaya] said he would also try to protect our fee in the commitment should the deal not close."); Ex. D, Email from Giguere to other principals of London Manhattan, Nov. 15, 2007 ("Randall [Fontes, with Atalaya] has agreed to make us whole

on our fee and will build in an additional $200,000 on his end. Total fee will be $450,000."); Ex. E, Email from Ron Giguere to other principals of London Manhattan, Dec. 6, 2007 ("Randall [Fontes, with Atalaya] will protect us on 200k of our fee.").[2]

### III. Once the deal between Credit Solutions and Atalaya stalled, London Manhattan filed a complaint and accused Credit Solutions of fraudulently breaching the parties' contract.

Rather than pressing forward with its contractual obligation to procure or provide a loan for Credit Solutions, London Manhattan did not seek alternative financing. Instead, it served Credit Solutions with a complaint alleging two causes of action—breach of contract and breach of contract accompanied by a fraudulent act—and, incredibly, seeking a commission of $925,000 for a loan that never closed. Compl. *passim* (Dkt. No. 1-1).[3] In response to this attempted extortion, Credit Solutions filed counterclaims for breach of contract and a violation of the South Carolina Unfair Trade Practices Act. Ans. & Countercls. *passim* (Dkt. No. 5).

Credit Solutions now seeks an order granting summary judgment in its favor on both of London Manhattan's claims, as each is without any evidentiary support. For instance, there is no legitimate dispute that Credit Solutions fully performed all of its contractual obligations, such as keeping London Manhattan fully informed of any material changes taking place with the company, like the sale of the company from one individual owner to another. Further, London Manhattan's claims are squarely rebutted by the plain terms of the parties' contract, which does not allow London Manhattan to recover any fee in the absence of a closing. Finally, there is simply no proof that Credit Solutions has done anything fraudulent here.

---

[2] London Manhattan produced its relevant email correspondence in this case as one continuous document that spans approximately 900 pages. In order to present these documents in a readily-understandable format, counsel has highlighted the relevant portions of emails cited as exhibits.

[3] As will be shown at trial, these allegations are virtually identical to those found in complaints that London Manhattan routinely files in South Carolina against other out-of-state companies from whom it seeks a broker's commission for loans that never closed.

## STANDARD OF REVIEW

To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that it is, therefore, entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c). Thereafter, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." *Id.* 56(e)(2). Importantly, if the evidence favoring the non-moving party is "merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted). Likewise, if the Court finds that "the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, the Court must grant summary judgment against that party." *Creech v. N.D.T. Indus., Inc.*, 815 F. Supp. 165, 166 (D.S.C. 1993) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990)).

## ARGUMENTS AND AUTHORITIES

**I.     The Court should grant judgment in Credit Solutions' favor on London Manhattan's breach of contract claim.**

In order to prevail on its claim for breach of contract, London Manhattan must prove that Credit Solutions breached a material part of the parties' agreement and that it incurred damages as a result. *Fuller v. E. Fire & Cas. Ins. Co.*, 240 S.C. 75, 89, 124 S.E.2d 602, 610 (1962). Of course, when, as here, "the terms of a contract are clear and unambiguous, this Court must enforce the contract according to its terms regardless of its wisdom or folly." *S. Atl. Fin. Servs., Inc. v. Middleton*, 356 S.C. 444, 447, 590 S.E.2d 27, 29 (2003) (citations omitted). Further, "[a] contract is read as a whole document so that 'one may not, by pointing out a single sentence or clause, create an ambiguity.'" *Id.* (citations omitted). It is likewise settled that contracts should

5

be strictly interpreted against the drafting party—here, London Manhattan. *Myrtle Beach Lumber Co. v. Willoughby*, 276 S.C. 3, 8, 274 S.E.2d 423, 426 (1981). Because unambiguous terms of the agreement make clear both that Credit Solutions fully performed its contractual obligations and that London Manhattan is not entitled to any commission, the Court should enter judgment in Credit Solutions' favor on this claim.

> **A.     London Manhattan's breach of contract claim fails because Credit Solutions complied with its duties under the contract.**

London Manhattan's breach of contract claim fails because Credit Solutions fully performed its contractual duties here. At the Rule 30(b)(6) deposition of London Manhattan, the company's president was asked to identify every way London Manhattan contends that Credit Solutions breached the parties' agreement. He responded with four alleged breaches that mirror the allegations of the complaint: (1) that Credit Solutions somehow "defaulted" on a mere financing proposal; (2) that Credit Solutions failed to inform London Manhattan about the possible sale of Credit Solutions' stock from a prior owner to the current one; (3) that Credit Solutions received alternate financing without paying London Manhattan a commission fee; and (4) that Credit Solutions generally did not deal in good faith. Ex. B, Dep. Giguere 10:15–11:10. None of these allegations, however, has any actual evidentiary or legal support.

> **1.     Credit Solutions did not default on a contract for financing because no binding financing agreement ever existed.**

The first alleged breach of the parties' contract is that Credit Solutions somehow defaulted on a separate loan agreement between it and Atalaya, the lender to whom London Manhattan directed Credit Solutions. As London Manhattan's president alleged: "Credit Solutions defaulted on a financing after having accepted it, is one of our allegations and one of our areas of contention." *Id.* 10:15–16. At its core, this allegation assumes that a contract under

which Credit Solutions could have defaulted actually existed between Credit Solutions and Atalaya. Undisputed evidence shows that this is not the case.

At the outset of Credit Solutions' negotiations for a loan from Atalaya, Atalaya presented a "term sheet" proposing a $40 million loan and certain other possible terms for Credit Solutions' consideration. A term sheet is not a contract between a lender and a prospective borrower; instead, it is simply an outline of a possible deal that may be struck in the future, depending on the outcome of several intervening investigations and financial evaluations. As one of Atalaya's principals described:

> [A term sheet] is an outline of the investment that we are going to make in a company. So it talks about pricing, maturity of the loan, the amortization requirements and some of the other softer issues of the loan, ***subject to, you know, further due diligence and documentation***. As I think everyone in this room can appreciate, a credit agreement tends to be a five- or six-hundred page agreement with its ancillary documents. A term sheet is seven or eight pages. So it's not encompassing.

Ex. F, Dep. Randall Fontes, Atalaya Capital Management, 8:6–18 (Mar. 31, 2009) (emphasis added). Another of Atalaya's principals was explicit that a term sheet does not constitute a binding agreement to provide a loan:

> It's nonbinding. It is not vetted by an investment committee. An investment committee must sit down at the end of the day when all of the facts are known and researched, and all of the work has been done, and all of the terms are laid out. Not some of the terms, all of the terms.

Ex. G, Dep. Todd Kuhl, Atalaya Capital Management, 19:1–6 (June 18, 2009).

Additional documents produced by London Manhattan reinforce the fact that a term sheet does not constitute a loan agreement. For instance, drafts of proposed contracts between Credit Solutions and Atalaya always bore a legend at the top that left no doubt that Atalaya had not yet approved any loan for Credit Solutions. Ex. H, Cover Page of Draft Loan Agreement (Oct. 30,

7

2007); Ex. I, Cover Page of Draft Loan Agreement (Nov. 21, 2007).[4] And the fluid nature of the term sheet was confirmed by the fact Atalaya continuously reduced the amount of possible financing from $40 million down to only $12 million before the deal ultimately collapsed. Ex.G, Dep. Kuhl 23:1–4.

The absence of any binding agreement between Credit Solutions and Atalaya—or any other lender—is fatal to London Manhattan's claim that Credit Solutions breached its contract with London Manhattan because Credit Solutions "defaulted on a financing after having accepted it." Accordingly, this allegation is insufficient to support London Manhattan's breach of contract claim.

### 2. London Manhattan was fully aware of discussions regarding the sale of Credit Solutions' stock from a prior owner to its current one.

The second alleged basis for London Manhattan's breach of contract claim is that Credit Solutions failed to disclose the fact that Matt Reivett, a former owner, and Doug Van Arsdale, its current owner, were in negotiations for Van Arsdale to obtain all of Credit Solutions' stock in exchange for the forgiveness of a personal debt between the two. *See* Ex. B, Dep. Giguere 10:18–21 ("Credit Solutions did not keep us informed of negotiations that were ongoing with Doug Van Arsdale, which is another contention in our suit."). This allegation, however, is completely undercut and discredited by correspondence that London Manhattan produced in discovery.

---

[4] For ease of reference, Credit Solutions has only attached the first page of several voluminous documents that are exhibits to this Motion. Included among these truncated exhibits are draft loan agreements between Credit Solutions and Atalaya (Exhibits H and I), a promissory note and settlement agreement between Credit Solutions' previous owner and its current one (Exhibits N and O), and a class action complaint filed in the Western District of Washington (Exhibit R). Credit Solutions believes that the relevant information for which these documents are cited is fully contained in their respective cover pages. However, in the event that the Court wishes to review these materials in their entirety, counsel would be pleased to provide full copies to the Court.

Over one month before Van Arsdale acquired all of Reivitt's stock in Credit Solutions, London Manhattan's president emailed his fellow principals to notify them that those two individuals were in negotiations with one another: "Big meeting tomorrow with Doug [Van Arsdale] and attorneys and Credit Solutions. They are going to try to hammer out a deal." Ex. J, Email from Giguere to other principals of London Manhattan, Oct. 30, 2007. And not only was London Manhattan aware of Van Arsdale's involvement in this transaction, London Manhattan itself consistently communicated with him. This unbroken line of communication was memorialized in numerous emails among London Manhattan's principals. *See, e.g.*, Ex. K, Email from Giguere to other principals of London Manhattan, Oct. 18, 2007 (explaining that "someone is going to have to negotiate with Doug [Van Arsdale]" about the prospect of his obtaining Credit Solutions); Ex. L, Email from Giguere to other principals of London Manhattan, Oct. 30, 2007 (memorializing that Giguere had completed a telephone call with Van Arsdale); Ex. M, Email from Giguere to other principals of London Manhattan, Nov. 12, 2007 (notifying other principals of London Manhattan that "Matt [Reivitt] has given Doug [Van Arsdale] an open option (can be exercised at any time) to buy the company back").

This battery of correspondence makes clear that London Manhattan was fully aware of discussions relating to the transfer of Credit Solutions' ownership from Reivitt to Van Arsdale. Any argument that Credit Solutions breached its contract with London Manhattan by withholding such discussions from London Manhattan should fail as a result.

### 3.     **Credit Solutions did not receive a loan from any source.**

The third alleged factual basis for London Manhattan's breach of contract claim is that the transfer of Credit Solutions' ownership from Reivitt to Van Arsdale constituted financing for which London Manhattan should be paid a commission. *See* Ex. B, Dep. Giguere 10:22–25

9

(claiming that as a result of the negotiations between Reivitt and Van Arsdale, Credit Solutions "received a forgiveness of a debt which we do a fee on").  This position is both factually wrong and misreads the parties' contract, which London Manhattan itself drafted.

First, there is no dispute that the Reivitt-to-Van Arsdale transaction was strictly personal between the two and was designed to extinguish a promissory note that Reivitt owed to Van Arsdale.  Ex. N, First Page of Promissory Note between Van Arsdale and Reivitt (Dec. 1, 2006); Ex. O, First Page of Agreement of Compromise and Settlement between Van Arsdale and Reivitt (Nov. 30, 2007).  There is no evidence that Credit Solutions ever carried the sum Reivitt owed to Van Arsdale on its own financial books.  As a result, London Manhattan cannot legitimately claim any commission on a financial deal that did not involve a party with which it was in privity of contract.

Second, under the plain terms of the parties' contract, London Manhattan is only entitled to commissions for "Financing."  *See* Ex. A, Agreement ¶ "Compensation," at 2 (stating that London Manhattan's "investment banking fee" would be 1.25% "of the Financing calculated on the basis of all transactions . . . in the Financing").  Importantly, "Financing" is a defined term in the agreement, and it is designated to include only "senior debt facilities" of "up to forty-million dollars or more."  *Id.* ¶ "Engagement and Duties of LMC," at 1.  It is straightforward that the Reivitt–Van Arsdale deal involved neither Credit Solutions taking on any additional debt nor Van Arsdale providing the company with a loan.  Accordingly, that transaction does not entitle London Manhattan to any commission fees under the parties' contract, and it cannot serve as a basis for London Manhattan's breach of contract claim as a result.

### 4.     Credit Solutions performed under the contract in good faith.

The final alleged breach of the parties' contract is that Credit Solutions simply did not deal in good faith here.  During London Manhattan's Rule 30(b)(6) deposition, its president claimed that Credit Solutions "was not dealing in good faith with us in terms of executing on the financing we had arranged on their behalf." Ex. B, Dep. Giguere 11:1–5.  But when pressed for the factual foundation for this generic allegation, he was only able to point to two baseless claims:  (1) that London Manhattan was unaware of the Reivitt–Van Arsdale discussions, and (2) that Credit Solutions had defaulted on a loan agreement. *Id.* 20:19–21:4.  These two claims are fully rebutted above, and there is no evidentiary support for either.

London Manhattan's allegations are further undercut by testimony from Atalaya regarding Credit Solutions' conduct during the relevant period.  Atalaya personnel confirmed that Credit Solutions was fully compliant during the so-called "due diligence process":

> Q: Was the company [Credit Solutions] working with you during the due diligence process, providing you the information you requested?
>
> A: Yes.
>
> Q: There weren't not provide—I mean, they assisted during the process?
>
> A: Yes.
>
> Q: Okay.  And they had their personal auditors, I think, assist you as well, Whitley Penn?
>
> A: I don't recall, but it's probable.  They were—they were not obstinate in the due diligence process.

Ex. F, Dep. Fontes, 27:21–28:8.  Accordingly, there is no basis for London Manhattan's claim that Credit Solutions operated in bad faith here.  It should be disregarded as a result.

In sum, undisputed facts squarely rebut each of the alleged bases for London Manhattan's breach of contract claim.  Credit Solutions fully disclosed all relevant information and performed its contractual obligations in good faith, but was never able to come to terms on a loan agreement with Atalaya.  Further, London Manhattan was aware that Credit Solutions' former and current owners were in discussions about a transfer of stock ownership and, in fact, was involved in those conversations.  Finally, London Manhattan is not entitled to any fee under the parties' contract for the forgiveness of a personal debt held by Credit Solutions' former owner.  For these reasons, the Court should grant judgment in Credit Solutions' favor on London Manhattan's breach of contract claim.

### B.     London Manhattan does not have any recoverable contractual damages.

In addition to failing to identify a single breach of the parties' contract for which there is evidentiary support, London Manhattan's breach of contract claim fails for want of any recoverable damages.  It is settled that the absence of any provable damages is fatal to a breach of contract claim.  *See Gauld v. O'Shaugnessy Realty Co.*, 380 S.C. 548, 562–63, 671 S.E.2d 79, 87 (Ct. App. 2008) (affirming summary judgment against a breach of contract claim because the plaintiff failed to provide "competent, admissible evidence of the existence or amount of damages").  Here, though, London Manhattan seeks recovery of approximately $925,000 in commission fees without any prospective loan to Credit Solutions ever closing.  London Manhattan calculates this sum by applying its 1.25% brokerage fee to (1) the balance on the promissory note that Reivitt owed Van Arsdale, which was allegedly $34 million at the time that they settled their personal dispute; and (2) the $40 million that Atalaya initially indicated it may be willing to loan to Credit Solutions, but which was subsequently whittled to $12 million and ultimately never provided.  Ex. B, Dep. Giguere, 25:4–26:7.

Neither of these categories of damages is recoverable here. The personal nature of the Reivitt–Van Arsdale transaction, coupled with the fact that it did not involve any "Financing" or loan to Credit Solutions, forecloses London Manhattan's argument with respect to the first category of damages. *See* discussion *supra* Section I.A.3.

Regarding the second category, the parties' contract and London Manhattan's own website confirm that any commission owed to London Manhattan would be payable only if a prospective loan actually closes. *See* Ex. A, Agreement ¶ "Payment," at 2 (stating that London Manhattan's fees "are payable at closing as provided herein"); London Manhattan Company, "Commercial Financing Without Advance Fees" ("We do not charge advance fees, and our fees are paid from the proceeds of new financing acceptable to you, the client, at the closing. ***No closing, no fee.*** And it's entirely your decision whether or not to close.") (emphasis added), *available at* http://www.londonmanhattan.net/index.htm (last visited Sept. 25, 2009). The only apparent exception to this strict contractual provision is that a fee may be owed to London Manhattan if Credit Solutions "intentionally defaults" on a loan agreement. Ex. A, Agreement ¶ "Payment," at 2. As discussed above, however, no such loan agreement ever existed, rendering this exception wholly inapplicable here. *See* discussion *supra* Section I.A.1.

Just as a realtor cannot receive commissions until a home sale closes, London Manhattan has no claim to a commission for a financial deal that never closed. Accordingly, it does not have any provable, recoverable damages associated with its breach of contract claim. The Court should grant judgment in Credit Solutions' favor on this claim for this additional reason.

## II.    The Court should grant judgment in Credit Solutions' favor on London Manhattan's claim for breach of contract accompanied by a fraudulent act.

London Manhattan's second claim should likewise fail. To successfully establish a breach of contract accompanied by a fraudulent act, London Manhattan must prove that Credit

Solutions breached the parties' contract, that it did so with a fraudulent intent, and that there was a fraudulent act that accompanied the breach. *Conner v. City of Forest Acres*, 348 S.C. 454, 465–66, 560 S.E.2d 606, 612 (2002). The third element must be shown by clear and convincing evidence. *Osborn v. Univ. Med. Assocs. of the Med. Univ. of S.C.*, 278 F. Supp. 2d 720, 740 (D.S.C. 2003). Because no evidence supports London Manhattan's fraudulent breach claim here, the Court should grant judgment in Credit Solutions' favor on this claim as well.

### A.    Credit Solutions fully performed under the parties' contract.

As discussed above, no facts support the claim that Credit Solutions breached its contract with London Manhattan. London Manhattan's claim for a fraudulent breach of contract necessarily fails as a result. *See Downs v. FRS, Inc.*, No. 0:06-cv-2204-CMC, 2007 U.S. Dist. LEXIS 77214, at *21–22 (D.S.C. Oct. 16, 2007) ("The failure of the breach of contract claim necessarily defeats recovery for breach of contract accompanied by a fraudulent act.").

### B.    There is no evidence to support any argument that Credit Solutions operated with a fraudulent intent here.

Even if the Court finds that London Manhattan's breach of contract claim should survive summary judgment, its claim for a fraudulent breach is nonetheless deficient because of the absence of any proof that Credit Solutions performed under the contract with a fraudulent intent. In fact, London Manhattan conceded this point in its complaint, which alleged that Credit Solutions "either knew of . . . or acted in complete, total, and reckless disregard of the truth" when dealing with London Manhattan. Compl. ¶ 20 (Dkt. No. 1-1). As this Court has noted, such a concession entitles a defendant to judgment on a claim for a fraudulent breach. *See Ring v. Sports Auth., Inc.*, No. 6:04-21848-HFF-WMC, 2006 U.S. Dist. LEXIS 2884, at *2 (D.S.C. Jan. 10, 2006) (holding that "plaintiffs conceded lack of fraudulent intent by arguing that defendants acted 'with at least reckless disregard of its promise (if not actual intent)'").

14

Further, the allegation that Credit Solutions deceptively used London Manhattan's services with no intent to secure a loan is flatly rebutted by the fact that Credit Solutions paid out approximately $225,000 in fees to obtain the financing that London Manhattan promised. Ex. P, Confirmations of Payments to Atalaya by Credit Solutions. It is inconceivable that a party in need of several million dollars of financing would actually pay nearly a quarter of a million dollars out of its own pocket if it had no real intention of securing a loan. Instead, any claim that Credit Solutions acted with the requisite fraudulent intent is based on nothing more than speculation, which is insufficient as a matter of law to sustain this claim. *See Rotec Servs. v. Encompass Servs.*, 359 S.C. 467, 470–71, 597 S.E.2d 881, 883 (Ct. App. 2004) (holding that "more is required than mere speculation" to maintain the fraudulent intent element). London Manhattan's claim for fraudulent breach should fail as a result.

### C.  London Manhattan has not identified any fraudulent conduct by Credit Solutions.

Finally, there is no evidence that Credit Solutions performed any fraudulent act necessary to support the third element of a claim for a fraudulent breach. Courts typically look for clearly deceptive acts to support this element, such as procuring a customer's signature on blank documents and then filling them in with false information, *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 54–55, 336 S.E.2d 502, 504 (Ct. App. 1985); knowingly delivering nonconforming goods to a customer, *Park Place Corp. v. Indus. P.F., Inc.*, No. 6:06-cv092295-HMH, 2007 U.S. Dist. LEXIS 35986, at *14–15 (D.S.C. May 16, 2007); or deceptively misappropriating property that is held in trust, *Harper v. Ethridge*, 290 S.C. 112, 118–19, 348 S.E.2d 374, 377–78 (Ct. App. 1986).

Here, London Manhattan has not identified any conduct that rises to this level dishonesty. Instead, it again points to the Reivitt–Van Arsdale negotiations, this time claiming that those

15

discussions were somehow fraudulently held. Ex. B, Dep. Giguere, 22:19–22, 23:3–6. As explained above, though, email correspondence provided by London Manhattan removes any doubt that it was fully aware of—and involved in—those discussions. *See* discussion *supra* Section I.A.2.

Additionally, London Manhattan alleges that Credit Solutions improperly failed to disclose information regarding two legal matters: (1) an investigation by the New York Attorney General and (2) a pending putative class action. Ex. B, Dep. Giguere, 22:13–19, 23:7–19.[5] Neither of these matters, however, even existed when the parties entered into their contract. In fact, the situation involving the New York Attorney General did not materialize into anything substantive until May 2009, almost a year and a-half after this case was filed. *See* Office of the Attorney General, New York, Press Release of May 19, 2009 (announcing lawsuit against Credit Solutions and others as part of a general investigation of the industry), *available at* http://www.oag.state.ny.us/media_center/2009/may/may19b_09.html (last visited Sept. 25, 2009). Likewise, email correspondence produced by London Manhattan makes clear that it was made aware of the putative class action less than a week after that complaint was filed. *See* Ex. R, Email from Ron Giguere to other principals of London Manhattan, Nov. 13, 2007 (discussing class action filing). Because the existence of these legal matters was not wrongfully withheld from London Manhattan, London Manhattan cannot satisfy the final element of its claim for a fraudulent breach of contract. The Court should enter judgment in Credit Solutions' favor on this cause of action accordingly.

---

[5] London Manhattan's president testified that the putative class action case was pending in California, but this was likely a mistake, as the only putative class action that has been filed against Credit Solutions was in Washington. Ex. Q, First Page of Complaint, Case No. 2:07-cv-01815-JCC (W.D. Wash. filed Nov. 8, 2007). No class has been certified in that case.

## **CONCLUSION**

When Credit Solutions hired London Manhattan to find a much-needed revenue source, all that it received in return was another expense source. After Credit Solutions paid nearly $225,000 in fees in exchange for zero financing, London Manhattan filed this suit for nearly one million dollars in brokerage fees on a deal that never closed, which is in complete defiance of its **"**No Closing, No Fee" guarantees and the plain terms of the parties' contract. Because there is no factual or legal basis for either of London Manhattan's contract claims, the Court should grant this Motion and issue judgment in Credit Solutions' favor on both of these causes of action.

        HALL & BOWERS, LLC

        By:/s/ M. Todd Carroll
           Federal Bar No. 9742
           Kevin A. Hall
           Federal Bar No. 5375
           1329 Blanding Street
           Post Office Box 12107
           Columbia, SC  29211
           (803) 454-6504

        Attorneys for CSA-Credit Solutions of America, Inc.

Columbia, South Carolina
September 25, 2009